Stadford v. Secretary of Pennsylvania Department of Corrections Mr. Mullen Thank you, your honor. May it please the court. My name is Daniel Mullen. I'm here on behalf of the Secretary of the Department of Corrections. If I may, I'd like to reserve four minutes of my time for rebuttal. Thank you. As this panel is well aware, this is not the first time that this case has been before this court for oral argument. In 2017, when Stradford 1 was argued, then Chief Judge Smith made a very apt observation when he number of particularly high hurdles to overcome to prevail in their equal protection claim in light of the fact that this case calls for rational basis review of a policy pertaining to convicted sex offenders. All that's true. But you had a win under your belt at that point. You had a case dismissed with prejudice. And then you, the Department of Corrections, decided to change the policy and put the whole thing in play again. So that being the case, let's take the case from where it is today. Chief Judge Smith Yes, your honor. Mr. Mullen And where it is today is you lost on summary judgment. Now, nobody's disagreeing that we're dealing with rational is why, in developing a summary judgment record, did the state not produce any evidence? I understand your argument that we don't have to. But why would you go in and not provide metrics that give the comparison, which is the only comparison that seems to matter here, and that is the differential between the amount of time sex offenders spend incarcerated trying to get into a halfway house and the amount of time that other types of offenders spend in incarceration before they can get into a halfway house? The Commonwealth did nothing to answer the statistical evidence put forth by the plaintiffs in that regard. I'm very puzzled by that. Chief Judge Smith Your honor, it was because their statistical evidence was so deeply flawed. And it was their burden to prove their theory of the case, which is that... Mr. Mullen So why wouldn't you say, hey, that's deeply flawed, and here's the right stuff? You left the district court with nothing but their comparative evidence. So we took it. The district court took it. Chief Judge Smith But your honor, that turns the standard on its head. The record had to be viewed in the light most favorable to us in terms of their motion for summary judgment. And I mean, I think a good analogy here, your honor, is suppose the central claim a plaintiff was making was that, you know, ice cream causes drowning. And they say, here's a chart that proves every year when ice cream sales go up, drownings go up. I don't think we would have to respond with statistical evidence disproving it. We would say their evidence commits a fundamental error, which is it conflates correlation with causation. And that's exactly what their evidence did here. They said, you know, because of this community sensitivity factor, this exists. This must be the sole reason for the disparity. Mr. Mullen Are you arguing that there's not a disparity? Chief Judge Smith We're not arguing that there's not a disparity. Mr. Mullen Are you arguing that the disparity is not a result of the fact that the people who are spending more time in prison are sex offenders and that's the reason? Chief Judge Smith But their claim, your honor, is that the reason is solely the community sensitivity factor. And so there are other factors in play that are also relevant to them being sex offenders. So, for example, the maximum sentence state, your honor. So and I think, you know, their focus on one particular parolee, Mr. Decker, kind of demonstrates what we're talking about here. We read your papers. They can't even be teed up for halfway house consideration unless the parole board has decided they're not going to be a danger to the community. Is that right? Chief Judge Smith That's correct, your honor. But we also have a parallel designation when you're talking about sexually violent predators in particular. And the parole board can't remove that SVP designation. And this applies, the problem they're identifying or pointing to isn't just sexually violent predators. It's all sex offenders. Is that right? Mr. Decker You know, again, this is not something we know because their numbers didn't distinguish between SVPs and other sex offenders. Chief Judge Smith I'm not talking about what their data is. I'm asking you, their claim doesn't just cover sexually violent predators. It's sex offenders generally. Am I right about that or am I wrong? Mr. Decker That is their claim, that sex offenders generally have a disparity. We, again, dispute aspects of that. Chief Judge Smith Yeah, with what evidence, right? We're back to that. You've disputed, but you didn't come forward and show, here's our data. You've made a showing. We think your data is flawed, and here's why. But your position is, and at this podium remains, we had no obligation to give the district court anything other than our argument. Mr. Decker Our position is they didn't make the showing in the first place because their numbers didn't distinguish between sex offender, regular sex offenders and SVPs. And I suspect had they made that distinction in their numbers, what we would have seen is the non-SVP sex offenders have comparable delay times to other parolees. It's really the SVPs that experience the- Chief Judge Smith They didn't do that, and the Commonwealth had no obligation to show the district court anything else. You could just say you didn't do it and rest on burdens of proof. That's the position you're taking right now, correct? We don't have to be ashamed of it. That's the position you're taking. Mr. Decker Yes, I think that is one possible avenue for defeating a motion for summary judgment is to say that the party with the burden didn't satisfy it. Chief Judge Smith It's not the possible avenue. It's the avenue the Commonwealth chose and is pursuing right now. Mr. Decker Yes, Your Honor. Chief Judge Smith Okay. Rational basis review. And one of the things that is a common kind of event or occurrence or characteristic of constitutional litigation is that rational basis review begins to sneak up into some heightened form of scrutiny. And the fastest and quickest way for it to sneak up into some heightened form of scrutiny is to consider individual facts of an individual case. Because rational basis is not about the consideration of individual facts in an individual case. It's looking at things at the broadest, most basic level, looking for any reason that the government could have used that would have been legitimate to do it. It's a very theoretical item. As we begin to drift into a greater factual inquiry, we now drift into a heightened level of scrutiny. So at one level, your decision or the Commonwealth's decision not to bring in or not to challenge evidence is interesting, but you still have complete licenses, I understand it, for saying that it was still legitimate and still rational, the distinctions that were made. And so it seems that, and I guess you could also say since it's an equal protection challenge, that there wasn't complete similarity between all of the members of the plaintiff's class and the rest of prison population. So it strikes me that on rational basis review, the analysis focus on equal protection focus on three things. One, do we have similarity? Two, was there a legitimate purpose? And three, was it rationally related to that? So I'd like to hear you talk about those three avenues, because that to me is where the constitutional analysis is. And you can go in any order. I think the one that would be most interesting for me to start with would be the legitimacy of the motive, because we've got cases like Cleburne. Cleburne cites with, I believe, approval, Palmer v. Sidoti. Palmer v. Sidoti says that we cannot rely on the irrational and unfounded prejudices of a community when we determine whether or not government action is legitimate. And so why is what's going on here not a Palmer v. Sidoti problem? Yes, Your Honor, I'll take that last aspect first. I think what Palmer and Sidoti of Cleburne are talking about, and again, in particular with Sidoti of Cleburne, what I think is important there is that we're talking about an irrational prejudice against a group with an immutable characteristic, the intellectually disabled. And there's nothing irrational about a community feeling a certain way about a high volume of sexually violent predators coming into their community. That's why we have Megan's Law in the first place. That's why we have these community reporting requirements and these registration requirements, is because communities have a right to know that if a high volume type of offender that has an alarmingly high risk of recidivism is coming into their community. But starting, Your Honor, if I could, you say that there's an alarmingly high risk of recidivism, then why are they granted parole? I thought the point was the class was defined in a way of only those who were eligible to return to the community on parole. And so are you saying that those individuals, too, have an incredibly high risk of recidivism? Yes, Your Honor, because what the parole board lacks authority to do is remove the SVP designation. And there's also an individualized assessment that they go through before they are designated as SVPs. Isn't there an individualized assessment by the parole board about the danger to the community? I mean, that's the whole point. Right. They're brought in and they review the record and they decide this person can safely go into the community. Absolutely, Your Honor. But we have these two parallel determinations and one of them carries with it significant collateral consequences. The SVP designation, by definition, means that you are somebody that suffers from a mental defect that makes you extremely likely to commit additional violent sexual crimes in the future. I'm puzzled at the same thing that Judge Fitz is. If they are so likely to recidivate, so likely to commit a violent sexual crime again, is the breakdown here at the parole board? Should they not be sending sexually violent predators back out into the community? Your Honor, I think the parole board is making an assessment at a certain point in time that says, based on their conduct in prison, based on programming they've done, et cetera, that at this moment in time, this person can safely be released and serve the remainder of their sentence on the outside. Right. So then how can you look back to the SVP designation and say, just ignore what the parole board just did? Forget that. We're not saying ignore it, but what we're saying is that the SVP designation makes them dissimilar from other parolees with respect to placement in the halfway houses because that designation means communities have to be alerted to their presence and there are some very specific consequences that relate to housing. They can't get federally funded housing. Under state law, they can't go into group homes if there's already five SVPs there. And of course, they can't go into a home that might be near an elementary school or something like that. And so because it's harder for them to move on from the halfway house once they're there, it ends up turning into a permanent place for them. Can't both be true at the same time. The parole board says, as best we can tell, this individual is probably going to be okay, so we'll let him. But we acknowledge that he belongs to a group that's highly likely to be a parolee and we're doing our best. Absolutely right, Your Honor. But both can be true. And the SVP designation is still there. And so the question is, what does that mean for us when we have limited resources to allocate? I mean, that's what's going on here. We didn't sort of have some plot to punish sex offenders. There's only about 3,000 spaces and there's about 9,000 people released on parole every year. And so the question is what... I mean, the problem is in the equal protection analysis, this country doesn't always look to pragmatic concerns and budgeting and limited resources. Sometimes we issue decree and we say, I mean, Brown 2 was not about a... Do schools have the budget, the capacity to integrate? The decree was given. And so this is an equal protection case as well. So budget concerns might not come to the fore in the equal protection context like they do others. One question about the record, is the entire class carry the SVP designation or is it only some members of the class? Your Honor, I believe it's only some members of the class carry the SVP designation. And that... So that's harder at one level. I mean, at one level it shows that we don't have persons identically perfectly situated in all respects, right? Yeah, not even within the class itself. Yes. And so at one level that helps your case, but at another level that cuts against your case because when certain members of the class don't have the SVP designation, they now have more in the class. And so the testimony in this case was that they're placed in the same manner as every other parolee. And again, we don't know whether non-SVP sex offenders, we don't know what their specific delay time is. I suspect it's very comparable to non-sex offenders period. So it's really the SVPs that are experiencing the greatest delays here. I see I've got the red light. All right, we're on our time at this point. Any further questions, Judge Porter, Judge Phipps? No. Okay. Thank you very much, Mr. Mullen. We'll have you back on rebuttal. Thank you. Mr. Driscoll. Thank you, Your Honors. The pleas of the court, my name is Donald Driscoll. I'm here on behalf of the plaintiff class. I do think it's important first to talk about burden. The cases do indicate that in the ordinary equal protection case, the burden lies with the plaintiffs to overcome any conceived basis for the classification. Putting aside for a moment the reason to infer antipathy consideration, which I think is a considerable factor here, the cases also say that the plaintiffs do have an opportunity to negate presumed classifications. There's little in the Heller or the Beach case that describe what that opportunity entails, but if you look back on cases that those cases rely on- Justice Doe says they've got no burden to come forward with evidence on rational review, right? Initially. They have no responsibility to do that. Initially, unless that presumption is overcome. And in this case, there was substantial evidence submitted to overcome that presumption. It was undisputed that these individuals were delayed in their placement because of unfounded fear, no facts, designation alone, perception that was not justified, it was not warranted, was fear of legislative reprisal. It was conceptual. It was not at all, there is no demonstration at all that these individuals- Were a harm to the community. When you say there was no demonstration at all. First, let's zero in on what your claim is now, because this has shifted over time, it seems. Now, as I understand the claim that's being made, the argument is, the one you just articulated, that there is an irrational antipathy towards sex offenders, including sexually violent predators, and that that is embodied in the community sensitivity factor that the Department of Corrections uses for halfway house placement decisions, and that that constitutes then an equal protection violation. Have I articulated correctly what you're arguing now? That, in addition to the fact that there is no difference in circumstances presented at the time of the delay, as there are at the time of the delayed release, and thus that the delay is not justified, it's not rational based on, there's no rational basis for the delay itself. Well, let's unpack that. To begin with, as Judge Phipps pointed out to your colleague, you've got to establish that your cases are similarly situated to the rest of the prison population, right? Yes. Okay. How can it be the case that they are similarly situated when there are many laws on the books in Pennsylvania and across the country that identify particular problems with sexual offenders, and especially with sexually violent predators, warranting peculiar treatment for them, registration, notification, lifelong reporting requirements, reporting to the community requirements, all the things embodied in Megan's Law? How can it be irrational for the Department of Corrections to take that into account? Are you suggesting that Megan's Law and all those other statutes are violative of the Equal Protection Clause of the United States? They all have to drop because they're all irrational, because there's no difference between sexual predators and the rest of the prison population. Absolutely not, Your Honor. This case does not involve Megan's Law, the validity of Megan's Law. How does it not, if your argument is that there's no difference between sexual offenders and anybody else? The vetting process that goes on prior to the approval of parole considers individual circumstances, but collectively you're not paroled unless there's no reasonable indication that you present a risk of harm to the public. Judge Phipps has got a question. I'm sorry. You're muted, Judge Phipps. Yeah, let me get, thank you, Judge Lord. Let me get in in two ways here. One, doesn't the individualized assessment doom your Equal Protection Claim? I mean, once we go down the road of making individualized assessments about each person, given their own facts and circumstances, you can't prove similarly, you can't prove that there's no difference in circumstance in all relevant respects when everyone gets an individual hearing. There could be different parts of those hearings. It seems that that just dooms it already. Collectively, Your Honor, the of which is danger. Sexually violent predators present a different issue as far as that goes, and the Sexual Offender Assessment Board, they also are involved in the paroling process. They examine, they review, they pass on sexually violent predators who are granted parole. And it's an individualized determination based on each fact, each circumstance related to each parolee, right? But the determining factor is not an individualized factor. It is collective. It is that all of them must have been determined not to present a reasonable risk of harm to the community. But even when those... So even when we're in the reasonable risk of harm to the community, in order to get parole, they all have to clear that hurdle. No reasonable risk of harm to the community. And so if we were to break this down almost in a torts context, in a torts of harm. You say, okay, 1% of the people are going to be hurt, they're going to be hurt a million dollars. That's how you might calculate damages in the tort context. Here, it's a similar two-step process. A person who has no... A tax offender who has no reasonable risk of recidivism and harm to the community, it's rational for the community to say, okay, they have a 1% chance of recidivism. We view a tax offender's 1% risk of recidivism differently than we do a serial murderer's 1% risk of recidivism. It's that second step in terms of what the likely recidivism will be, not the likelihood of harm will be, that is a big difference here, isn't it? Your Honor, I would agree if there was actually any indication that recidivism is occurring, has occurred with the halfway house occupancy. There's absolutely no indication that that, and as a matter of fact, the testimony is just the opposite. But it's not evidence-driven at rational basis review. At rational basis review, all that is required is that there's some rationally conceivable reason for the regulation. It's not evidence-driven. Evidence-driven is what higher levels of scrutiny are about. Rational basis review is designed to allow the government to function with its maximum constitutional freedom before we say something's unconstitutional, unless you fall into heightened review. So the evidence doesn't really matter at rational basis review. Your Honor, I disagree. I think it is evidentiary-based when there is indication of invidious discrimination, as there certainly has been presented here. The only difference between the plaintiff class and everything else is the perception in the community that the DOC acknowledges is unfounded. That's not the only difference. When you say that's the only difference, there's the factors, there's a whole range of factors other than the community concern. But let's set that aside and assume that you were right, that there weren't a whole list of factors that the department was looking at, and they were only looking at community concern. When you say that's irrational, if you're focused on evidence, what's your evidence that that's irrational? What evidence did you bring to the table to say it's irrational for the people living next to a halfway house, you know, raising their kids two doors down, to be concerned that somebody is about to be put in that house that was put in prison for raping children? Where is your evidence for that, that it's irrational to think that way? You know, I'm not suggesting that that is irrational. What I'm suggesting is it is irrational for the Department of Corrections to exclude individuals based on, yes, a concern, but a concern that is unfounded, a concern that is not... Why is it unfounded? Because of the individual determination? No, because in the Department of Corrections experience operating halfway houses, there is no indication that actual harm is being presented to these communities. Over and over again, there were indications of complaints or concerns, but in each case, the testimony was that it was unfounded, that it was not based in, you know, facts. Well, let's just assume, even if we thought that was true, even if we thought that, oh my gosh, everybody in the state of Pennsylvania who's worried about having a child rapist next door is crazy. Even if we thought that was true, isn't it valid and a rational thing for the Department of Corrections to say, we're running a system here, and in that system, we have to deal with the realities of throughput, and the throughput is demonstrably harmed by having sexually violent predators and other sex offenders released into halfway houses before we can have a plan for them. If we do this without some specific plan for them, we know, based on our experience, that they're going to go, and they're going to stay, and they're going to prevent other offenders from coming in, and we can't get them out into the community. Now, there seems to be ample evidence for that. Is it not something rational for the Department of Corrections to take those sorts of things into account as they're deciding how to manage the halfway house program? Your Honor, there isn't ample evidence of that. There's no evidence of or placed successfully that the Bureau of Community Corrections is moving through these individuals. Wait. Let me make sure I understand. When the government says to us, when the Commonwealth says to us, here's how, these are the difficulties we face, and they have Department of Corrections personnel testify about that, you're saying that's no evidence. They're just making that up when they say that in their papers. Your Honor, I'm saying that evidence must be supported probatively. There has to be some probative basis in order for there to be a genuine issue of fact, and in this case, there was not. And there's no, even if we accepted your assertion that there has to be evidence, you don't think that's now bumping us out of rational basis review into something different? No, Your Honor, and the reason for that is because the burden... Did you give any evidence that it's not clogging the system? Didn't you just a few minutes ago say Heller presumptively says they don't have to come forward with evidence unless we come forward with evidence? Initially, Your Honor, yes. And did you come forward with evidence to say it's not clogging the system? I'm sorry. Yes, we did. We presented testimony that individuals are being successfully placed, that they are successfully Mr. Driscoll, that doesn't speak to the timing problem at all. The timing problem isn't that they get successfully placed. The timing problem is it takes longer to get them placed. Did you put any evidence in the record about that? Because if you did, I missed it. No, we did not. And the reason we didn't is because there was no indication that they were not moving through. There was testimony that one particular center that had approximately 40 percent sex offender occupancy presented no issues. But getting back to burden, though, when we adduce evidence such as that, that there is not a delay factor, the burden does shift to in a common rational basis analysis, the burden does shift back to the Department of Corrections to overcome that. And they did not overcome that. Why wouldn't this exact argument also apply to the registration, the reporting requirements, the federal housing, all of those? It seems to me that your argument would be the same argument to attack those laws because they, too, aren't founded with session evidence. Actually, the Megan's Law requirements provide protection to the community. They provide notification. They enable communities to prepare for individuals living in their society. But other criminal offenders aren't subject to those kind of reporting requirements. Yes. Why not? Well, there was a presumption in the enactment of Megan's Law that the communities should know about that. Is that an original presumption? I believe it was. And Megan's Law takes care of that. The communities are notified. Megan's Law does not provide that communities can exclude individuals. And that's exactly what's happening here. Is it irrational? Is Megan's Law irrational? No, I don't believe it is irrational, Your Honor. There is a difference. We recognize that there's a difference between sex offenders and non-sex offenders. The question is whether, at this stage, with these individuals having been vetted... Okay, but that vetting process doesn't turn them into non-sex offenders. Well, that's correct. But there is, yes, and there is the additional protection already built in for sex offenders to the community of community notification. But it does not include exclusion. A community cannot exclude. And that is, in fact, what is happening here. The Department of Corrections is acting on unfounded fear and the threat of legislative reprisal to keep out this class of individuals. Judge Phipps, I'm sorry. I think the inquiry is this, at least as I understand rational basis review, the question is, is there any conceivable rational basis for this policy? That's the inquiry. The Supreme Court tells us that again, and again, and again. And your burden is to negative every conceivable rational basis. And so, is it your position that there is... I mean, do you agree with that assessment of the law? That you have to negative every, not just factual basis that the Department comes forth, but every conceivable basis that the Department comes forth? Yes, I agree that it is our burden initially in the ordinary equal protection case. Now, the Heller case and the Beach case did make clear, didn't exactly explain what this was about, but other cases I think do explain that in the instance of invidious discrimination, that rule does not apply. The rule that they pronounce is, in the ordinary case, when there's not reason to infer antipathy, in this case, there is substantial reason to infer antipathy. I'm having a little challenge with that because I thought you just agreed that it's not invidious or irrational antipathy to make distinctions of the sort that Megan's law does. And here you're saying it is. And I guess that the only distinction you can come up with, and the one I've heard you make a couple of times is, that these are people who've been vetted by the parole board. Is there anything else you're pointing to that says, well, that's why this case is different from Megan's law and every other case and statute and regulation out there that makes a distinction? Yes, yes. Megan's law, those subject to Megan's law are not vetted by the parole process. It's the distinction that's made by the parole board about this specific offender's danger to the community. That's the difference. Yes. And the parole board doesn't do anything collectively as to the class. That's why I'm asking the question. I want to know what your position is. I'm not trying to play a game of gotcha. I want to know what your position is. So your position either has to be, these people are not a danger to the community because there's a parole board assessment. And that's what makes this different from Megan's law and HUD regulations and all the other things that treat sex offenders differently. Or your argument has to be, there's some group thing going on here and that group thing makes it different from others. I'm sorry. There's some group thing going on. You haven't identified how it's different from Megan's law or anything else. I wasn't clear on that, your honor. When I stated that, I meant that the standards that are applied by the parole board apply to entire population of those considered for parole. So then if I understood the position, the legal position correctly, then what you're saying makes this different and not a kind of argument that could be made against Megan's law and all the other laws of the sort that Judge Porter has noted and we've been asking you about, is that there's an individualized assessment by the parole board. Is that the thing that makes it this different from all those other instances where by statute, by regulation, by court decision, it's been repeatedly said sex offenders can be treated differently. It's the individualized assessment at the parole board. Is that the thing? Yes. Okay. Then we've got your... So let me just follow up on what decision the parole board makes. The parole board makes, as I understand it, a decision that there's no reasonable indication that the individual poses a risk to public safety. That's more or less what I think it is. And so is it irrational for members of the community to say we would actually like a stricter standard? The parole board uses a no reasonable indication of risk to public safety. That's what they use. But would it be reasonable for members of the community to say, you know what, when it comes to sex offenders, just no reasonable risk isn't good enough for us. We want more assurance than no reasonable risk. I don't think... I'm sorry, Your Honor. Is that invidious? Is that irrational? Or do they have to accept the standard that the parole board has chosen and used? Your Honor, I think it's understandable, but it is not based on fact. It is not considering that these individuals have been vetted for parole. That is the distinction. Under the Megan's Law, they're entitled to know about these individuals there, but they're not entitled to exclude them from the community. So I guess my question is, is it irrational for members of the community to think that the standard used by the parole board is too lenient? Is that irrational? Yes. Okay. Okay. Thank you very much, Mr. Driscoll. We appreciate it. And we'll go ahead and hear our rebuttal from Mr. Mullen. Thank you, Your Honor. A couple points. I'd like to address my friend's contention that there's somehow a burden-shifting analysis in play. I think as Judge Phipps correctly observed, it is his burden to negate every conceivable, plausible basis for the policy. And what the court held in the city of Claiborne is that the plaintiffs satisfied that burden. So I don't believe there's a burden-shifting analysis in play. It's his burden to demonstrate that the policy is completely irrational. And I think they failed to do that. And it's important to keep in mind that what we are doing here is fundamentally a community-based project. The point of these halfway houses is to give parolees temporary housing and link them up with resources in the community, help them find their own apartment, help them get a job so that they can then move on and become productive members of society. Yes, Your Honor. I'm sorry to do this because there may be other points you want to make on rebuttal. That's okay. But before you sit down, something that hasn't been talked about at all, so this is not truly rebuttal. I hope my colleagues, Mr. Driscoll, forgive me for this, but we didn't talk at all about the change in the relief that was ordered by the court. Yes, Your Honor. Before we wrap this up, I have one question that I want to ask you, and that is, other than the reporting that you're being required to do, is there some other thing that you, because we recognize you view that as a burden, is there some other thing that's happening with that shift that's causing the Commonwealth, Ajita, and thinking this just can't stand? Your Honor, our concern was in how the district court accepted their view that we were not complying with the judgment in the first place. And so the concern from our perspective is that a continued disparity of a single day, if that violates equal protection, that puts us in a position where we have to start disregarding other parts of the policy to get it down to zero, but we all agree that these other parts of the policy don't present a constitutional problem. And so the issue was, without an evidentiary hearing, he just accepted their contention that we weren't complying. I understand that you didn't like that, but the thing that's on you going forward is, you're going to have to report, or still do some reporting. That's the burden that's on you right now. Am I understanding that right? That's correct. Yes, that's correct. Shift back to your rebuttal. Yeah, okay. Thank you, Your Honor. And so I also would like to clarify the comment that we had successfully placed sex offenders. I believe the testimony was that we had successfully placed non-SVP sex offenders, and that we have a much harder time when it comes to placing SVPs. And so I understand the point that at the moment of the parole, grant of positive parole action by the board, they're all undergoing the same determination, but we have a different set of criteria that apply. And so the testimony was that your average non-sex offender parolee spends about 90 days there, and then they move on, and they're able to find their own place. That's not what happens with the sex offenders. They go there, they stay there for hundreds of days, sometimes for years, and it clogs the system, and it prevents us from placing other parolees who might be able to quickly move through. And so that's the interest here. We presented evidence that there was already one center that closed down because of community backlash to too many sex offenders being placed. I think that provides the plausible justification for our policy. There were, I think, seven or eight other communities that... But you don't disagree with the proposition that might be embedded in some of the questioning for Mr. Driscoll, which is you don't have to come forward with evidence if you've got a rational basis. Correct. It's his burden, but I think we nonetheless did come forth with evidence on the rational basis prong based on one center that had closed and other communities that were undertaking efforts to shut down centers. That obviously doesn't just harm sex offenders, that harms everybody if we have centers closing down. So that's what's at stake here. Okay. Any other questions? No. Any other questions, Mr. Phipps? No. Hold on just a minute. Yes, Mr. Driscoll. I did ask him something that wasn't covered. Go ahead. I'm sorry, just on the question of burden, because I didn't have opportunity to say this. The case law is... Well, now you're... That's... Yeah, you had your shot, and that's okay. We're not going to go back and forth. I had asked something about the change in the mandate, and if that's not what you're speaking to, then you had your opportunity to speak, and we have both sides' argument. It was well-briefed, it was well-argued. We appreciate counsel's time, but we are concluded. Thank you very much.